Good morning, your honors, and may it please the court. My name is Jared Renteria, and along with my co-counsel Karen Pata Moreno, I am representing Mr. Wilber Acevedo Granados. To begin, I will be arguing that the immigration judge and BIA erred in denying Mr. Acevedo relief under the Convention Against Torture and in ruling that he did not qualify for an exception from the one-year filing requirement for his asylum application. Ms. Pata Moreno will be arguing that his proposed social group was cognizable. Firstly, CAT is satisfied because the specific intent and probable likelihood of Mr. Acevedo being tortured is satisfied. The specific intent is satisfied by the administration of electroconvulsive therapy in the National Psychiatric Hospital in El Salvador, where virtually the only institution available to substantially treat patients with mental illnesses, including intellectual disability. Counsel, can I ask, what's the likelihood and what evidence was in the record about the likelihood that if he was sent back to El Salvador that he would be subject to that type of treatment? There's a number, there's a causal change that has to happen here, and I'm wondering what the evidence was that that would actually happen. Yes, Your Honor. There's evidence for each of the events that we are proposing happened. First, his intellectual disability is proven by the record and by the psychological evaluations that resulted from his competency evaluations, such as Dr. Tirani's evaluation. Further, it is proven that by his mother's testimony, where she was found to be credible, that he would likely be indigent and not have familial support, saying that his aunt would be unavailable to provide protection for him if he was in El Salvador. Further, on the streets, it is more likely than not that he would interact with the police based on his condition and based on his erratic behavior, especially when you consider the evidence that he previously had altercations with the police here in the United States, even while in the care of his family. And especially when considered in light of police in El Salvador, not being trained on mental illnesses, as well as performing arbitrary sweeps in response to the severe gang violence in the country. And as well as using... Oh, sorry, you're not finished? I didn't mean to interrupt. And then finally, once from the police interaction, he would be admitted into the forensic unit where he would be treated with ECT. The problem that I have with this particular situation is the standard of review, and it is substantial evidence review here, right? No, Your Honor, I would argue that it is de novo. How do you know what case says it would be de novo? We're determining whether the BIA or the IJ erred in denying cat relief. I have several cases here that say it's a substantial evidence review. Your Honor, I apologize. That's wrong. Your Honor, I apologize. Yes, you're right. In considering the evidence and in considering the likelihood of Mr. Acevedo facing torture, the standard is substantial evidence. And on specific intent to torture, for instance, it seems to me that Villegas v. Mukasey is pretty good precedent for the idea that the conditions that one has in a given country does not prove that there is any official or private person who has necessary specific intent to inflict the suffering upon the patients. So I don't know why that wouldn't be. Well, in fact, that's exactly what the BIA said. They said the conditions were not created with an intent, but rather reflect the difficulties inherent in addressing the complex public issue with insufficient material resources. There seems to be sufficient evidence or at least substantial evidence of that. Respectfully, Your Honor, I believe that this case can be significantly distinguished from Villegas. I'm not even asking you to distinguish it from that. All I'm trying to say is if my standard or view is substantial evidence, I'm thinking there is substantial evidence to sustain what the BIA said there. I believe that there is evidence in the record that specific intent is present when considering the unnecessary infliction of ECT and the manner in which it is administered in the National Psychiatric Hospital. What is that evidence? The evidence is that of the global condemnation of this procedure. I don't see how that speaks to the intent of the people in the country limited with their resources to using what they've got. How does that demonstrate that the people who are, you're saying, inflicting torture or intending to do so, what else do they have to work with? And what evidence is there that speaks to what their personal intent may be? The personal intent is demonstrated when we consider the Dr. Nichols testimony that the employees themselves, when interviewed, said that they bypassed any sort of consent protocol. The consent, which is very crucial to understanding and globally recognized as being a very important part of properly and correctly administering ECT, they completely bypass that and say that they don't ask because they know that the patients will refuse because it is a very invasive, it is a very painful procedure, and virtually has no response to, especially in the case of intellectual disability, a response to treating or being therapeutic for it. Your Honors, that is my time. Do you want to reserve for rebuttal? Yes, I would like to. Okay, very good. Ms. Moreno. Thank you, Your Honors. I will also be reserving two minutes for rebuttal. My name is Karen Parra Moreno, and today I will be talking about Mr. Acevedo's asylum claim and withholding of removal claim. I will discuss the particularity requirement and then the social distinction requirement to show that the proposed group is cognizable. Mr. Acevedo was diagnosed with an intellectual disability, which was previously referred to as mental retardation. Here, when we analyze the group as a whole and look at how the components of the group interact with one another, we see that the group satisfies the particularity requirement. An intellectual disability is a recognized mental illness with an established medical definition and a common set of symptoms. The clear-cut diagnosis provides definable boundaries, which create a clear benchmark for determining who falls within the group. Additionally, an intellectual disability's different severity levels does not make the group overbroad because it is sharply limited by the requirement of erratic behavior. Essentially, the DSM-5 supplies an adequate benchmark to the erratic behavior component of the group. Let me ask you a question. Did the IJ or the BIA even talk about the specific diagnosis of the petitioner, DSM-5? The DSM-5 was mentioned throughout the briefs. It was mentioned in the original briefs as well as the IJ. They did consider the fact that it was a diagnosis of an intellectual disability, and they did talk about its different severity levels throughout the proceedings. But it seems to me that they ignored the specific diagnosis of that analysis in their approach. I mean, they just were talking in general about disability or about mental illness. They didn't really focus in on the specific diagnosis of a DSM-5, which if you focus in on a DSM-5, it would be hard to argue that that was overbroad or overinclusive. That's why I asked you the question. Yes, Your Honor. I'm referencing the BIA decision now. They did talk about intellectual disability. In fact, it says, we also affirm the IJ's determination that the proposed group is not sufficiently particular. In this regard, we agree with the IJ that the imprecise contours of the intellectual disability and erratic behavior, and that is on page 5 of the administrative record. I understand that, but I'm trying to say, I mean, you can talk about mental illness in total, and you can say there's no particularity. But if you have to focus in on DSM-5, it seems to me at that point, particularity might go out the window. And so I said to myself, I think they might have erred. Yes, we do have to consider the DSM-5, and we did talk about intellectual disability specifically because our proposed group has a specific term, intellectual disability. It does not have the term illness. Therefore, that was the entirety of the discussion. And the DSM-5 is incredibly important to the particularity requirement because we know from previous cases that the DSM-5 supplies the adequate benchmark that gives further meaning to the term erratic behavior. And the component of the erratic behavior further limits the term of an intellectual disability, which is why the different severity levels does not make the group fail the particularity requirement. Let me change the emphasis just a little bit. It seems to me that one of the things that I don't know whether I really can think we can deal with is that the BIA did not even let the IJ talk about Group 2, which is indigent El Salvadoran men lacking familial support, suffering from severe mental disabilities, and exhibiting bizarre behavior. They didn't even talk about that, the IJ. And all the BIA did is say, well, it's not explicitly considered by the IJ, but we think for the same reasons, it's the same. Is that appropriate? No, Your Honor, it is not. And you do bring up a great point that when the BIA did that, they simply said that the group that we are currently analyzing essentially made up the two groups were almost the same. And in fact, they were not. The components of those groups were vastly different. And if we look at the case law that tells us that we have to look at the group as a whole, essentially what the BIA did was piecemeal these different groups and say that they were encompassed by one another when they were not. And that was an error from the BIA's part. What was the difference between the two groups? Yes, so our current group is El Salvadorian men with intellectual disabilities who exhibit erratic behavior. And the alternative group was indigent El Salvadorian men lacking familial support, suffering from severe mental disabilities, and exhibiting bizarre behavior. The second group did not mention intellectual disabilities and had a number of other components that were never discussed in the lower decisions as most of the analysis focused on intellectual disabilities. Furthermore, I would like to touch on the social distinction requirement before the end of my time. I would like to point out that there are a number of factors that are highly relevant when we're looking at social distinction. They are whether there's an existence of social stigma within the respective society, whether the society attaches a label to the individuals within the group, and whether there are the existence of laws or social programs that target the group, whether those programs or laws be positive or negative. Here we have all of those factors. Individuals with intellectual disabilities in El Salvador are subject to social stigma and call the locals. The UN report tells us that these individuals are deprived of fundamental legal rights, such as the right to marry, they're denied employment, unable to open a bank account, traveling on the public bus system. In fact, El Salvador's electoral code prevents these individuals from exercising their right to run for municipal office. Furthermore, the chronic unit at the National Psychiatric Hospital is specifically meant to house people with intellectual disabilities. There are a few schools in El Salvador that cater to children with intellectual disabilities, and the public school system has some special education programs for minors diagnosed with an intellectual disability. Overall, the fact that El Salvadorian society mistreats the group, deprives them of their fundamental legal rights, and labels them locals, shows that the group is socially distinct. The fact that El Salvadorians are overbroad in assigning the label of locals does not show that social distinction is lacking, because to determine that any time a persecutor's net is too large, social distinction is lacking, is a mistaken legal conclusion. Thank you, Your Honors. Thank you, Counsel. We'll hear from the government. Good morning, Your Honors. I hope you can hear me clearly. May it please the Court, Maria Luxer, for the respondents. There is no doubt that this is a sympathetic case, but relief and protection under the immigration laws are narrowly drawn and not designated to dramatic societal problems, and the petitioner has simply not met the standards to be eligible for relief and related protection in this case. Here, the agency recently concluded that petitioners propose particular social groups lack sufficient particular social distinction, and the agency also recently concluded that petitioners fail to establish clear probability of torture if returned to El Salvador. Accordingly, the Court should deny the petition for review. First, the record does not compile the conclusion that the petitioner's proposed social group, El Salvador men with intellectual disabilities who exhibit dramatic behavior, is sufficiently particular. Indeed, as the Board noted, the proposed group lacks particularity, because it could include individuals with vastly different intellectual disabilities and diverse behavioral manifestations. Well, I think you're going to need to deal with the question raised by Judge Smith, which is that we have here a specific diagnosis that seems to have come from the agency itself or the consultant retained by the agency. This isn't intellectual disability in a generic colloquial sense. This is a specific diagnosis under DSM-5, and that has definitions. That has boundaries, and it appears to me that the agency, neither the IJ or the BIA ever talked about that. Isn't that a problem? The agency did not exclusively discuss the definition as it is included under the American Psychiatric Association, the DSM-5. I did not see any record evidence that the definition itself under the DSM-5 was proposed or discussed before the immigration judge. It's plainly in the record. It is in the record, correct. So how is it the agency decides intellectual disability is a term that must have been meant in a lay fashion, not a professional fashion? If the record displays that there's an actual diagnosis of intellectual disability, why doesn't the agency deal with that? As the agency noted, the DSM, although the agency did not explicitly discuss the DSM-5 definition itself, as the agency noted, individuals could have vastly different intellectual disabilities and adverse behavior manifestations. Stop, stop, stop. I realize we've got technological barriers, but I don't want to just let that sit. You just recited what the agency said, but the agency is treating, quote, intellectual disability in a very lay fashion. And we have here a specific diagnosis. So I don't think it's accurate to say that the agency concluded that could cover a range of possibilities. It doesn't. We have a specific diagnosis. That diagnosis is tied to particular characteristics. The agency doesn't talk about that at all, assumes that that kind of limitation isn't there. Isn't that a problem? The DSM-5 definition itself provides a number of severity levels, and each level is further characterized itself by different behavior and abilities. And that is what the board in essence noted when discussing about the different intellectual disabilities and adverse behavior manifestations. And the group also includes the term erratic behavior. And erratic behavior itself is a question of perspective. Whether one perceives a particular behavior to be erratic is a question of perspective. And what that means may vary depending on an individual who thinks of or sees erratic or any type of behavior that one could perceive as erratic. Indeed, this court in Mendoza-Alvarez rejected proposed social group, all insulin-dependent diabetics or insulin-dependent diabetics who suffer from mental illnesses. Insulin-dependent diabetics also have a specific meaning within medical community. And in Mendoza-Alvarez, a petitioner was explicitly diagnosed as an insulin-dependent diabetic. And the court in Mendoza-Alvarez similarly concluded that if the board hears that individuals may have the condition as an insulin-dependent diabetic in varying degrees of severity and in different circumstances. So as the board concluded, similar to Mendoza-Alvarez, here circumstances are the same and the group lacks sufficient particularity. Let me ask you a couple other questions. It seems to me that the BIA did not even address the idea that the petitioner's diagnosis did not warrant an exception to the one-year bar for asylum. Is that true? No, the board... They didn't address that. I apologize, there is a delay. Pardon me? I apologize, there is a delay in when I'm speaking, so it may come across a little harsh. Yes, the immigration, the board did not address the one-year bar at all. The board did not reach the issue of one-year bar in this case. So that question is... Therefore, if I'm going to... Therefore, if I think that they should have addressed DSM-5, both as to particularity and as social distinction, then I should also send that back because they ought to address that too? They decided the issue of asylum on the particular social group alone. They did not separately reach the issue of one-year bar. I understand your answer. Let's go one further. Where did they discuss the second social group? And how is it... I know where they discussed it. They said it's never considered by the IJ, but we're going to decide it anyway. How can they do that? Given our standards, neither the BIA nor the Ninth Circuit is authorized to undertake the initial fact-finding necessary to determine the viability of a group. That's for Melania's. Seems to me they didn't do anything with group 2, and they have no right to make factual distinctions here. The board acknowledged that the immigration judge did not consider the group. Therefore, you can send it back, right? The board probably determined that there is no need to remand the case because it was largely encompassed by the initial proposed group. And if you look at the determination of the body, that's part of particularity. That sounds like a great argument, but that is a fact question as to whether one group is encompassed by another group. And the BIA can't make fact determinations. Name me a case that says they can. I am unable to provide a case name, Your Honor. Let me just jump in because, I mean, I think Judge Smith's on to something that they couldn't even do it. But it's not intuitive to me that even if they could, that the fact that, as we heard already, the differences between the two classes do seem to be distinct. The indigency requirement, the lacking of familiar support, and the fact that it would have to be severe, those all seem to be relevant factors that may go to some of the arguments that they're making about how likely it is that he would be subject to persecution when he goes back to, if he were sent back to El Salvador. Looking at, referring back to the board's initial determination as far as the first group's particularity, as to their mental disabilities, they are similar to their intellectual disabilities in the petitioner used terms intellectual and mental disabilities interchangeably before the board. And the board found that the first group lacked direct particularity because the group's boundaries were too amorphous, as the group included vastly different intellectual, disability, and diverse behavior manifestations. And adding the corrective characteristics such as indigence and lack of familiar support do not resolve that issue. This court in Mendoza-Alvarez concluded that insulin-dependent diabetics or insulin-dependent diabetics who suffer from multiple illnesses, whether or not they include additional modifiers, the group lacks sufficient particularity, and that is the issue here as well. But I guess my question was more fundamental. Do you agree that those are not two distinct classes? I mean, whether or not, setting aside the question of whether either should be recognized, don't you think that the second class covers different individuals in a different group than the first class? Or do you buy the argument that they just rolled into the same thing? The second group does include additional modifiers, indigence and lack of familiar support that the first group does not. And again, as I pointed out in Mendoza-Alvarez, the board, even with additional modifiers, concluded that the group was not sufficiently particular because... No, I understand your argument. I mean, and the board, you know, maybe they could determine that. But my only question is, shouldn't they have at least addressed each one in turn? And I think you've answered that. I think you've answered that question. They could still come up with the conclusion that you're advocating for. But you agree that they're different enough that they probably should be. But my question, but honestly, my question is not that. The BI couldn't make that determination at all. Exactly. That's something the IJ has to make. And that's something, if it's a fact and determination, they shouldn't be making any more than I should make it on the Ninth Circuit, which the government would not want me to start making that determination. That's my concern. I recognize your concern, Your Honor. If the board does believe that that is the case, then yes, the remand would be appropriate. However, here, as in Mendoza-Alvarez, again, the particularity, the determination itself, regardless of whether there are additional modifiers, do not resolve the issue of particularity. Because as part of the amendment, intellectual disability to exhibit except erratic behavior itself lacks particularity. Let me focus on another aspect, then. The psychological evaluation obtained by the agency in trying to determine whether a petitioner was capable of representing his own interests, which he wasn't, identifies him as having intellectual functioning equivalent to a 7-year-old, which is consistent with his general mental abilities observed throughout this evaluation. I don't know if you've ever been the parent of a 7-year-old, but I've had enough experience with 7-year-olds to be pretty confident that you don't want to send people like that out in the world by themselves. And I say that mostly because you can tell which way the wind is blowing here. I really wonder if the agency should reexamine its position on this case altogether. It's not just sympathetic, as you acknowledged at the outset. A 7-year-old? I mean, really? Is there anything you can offer that gives us confidence that somebody like that could cope if sent back as the agency proposes to do? And maybe that's something for you and the agency to think about after this. You've got another minute. Do you want to address the well-founded fear of persecution? It didn't look like the BIA had addressed that. Can you flesh that out anymore? Yes. The court did not reach the well-founded fear issue here. And very briefly, to address the denial of petitioner's gas claim, there is simply no evidence in the record to compel the conclusion that the petitioner established his eligibility for gas relief. First, as the immigration judge concluded, there was no evidence of torture in the past, and the petitioner established basically an affair about what might happen rather than his claim being supported by objective evidence that shows that it is more likely than not that he is subject to torture in El Salvador. Moreover, the agency recently concluded that the petitioner failed to show the requisite specific intent in this case. There is simply no evidence to show that the El Salvadoran government has created this substantive condition for the specific purpose of inflicting suffering upon the patient or that medical professionals administer treatment with a specific intent to inflict severe physical or mental pain or suffering. Okay. Nelson, you're over time. I think we have your argument. Thank you. Go ahead, Judge. If I might, Judge Nelson. Absolutely. Counselor, I hope you have listened very carefully to Judge Clifton. Judge Clifton's last questions and his last plea to you, I hope you were listening very carefully. And I hope you take that back to your bosses. Because, to be fair, all of these, in my mind, failures of the BIA in making their decisions will send this back. But it doesn't solve the problem. And that's why I personally am appealing to you to think very carefully about what Judge Clifton questioned you about as you address this case in the future and future cases. I have no authority to do that. I'm just trying to get you to think about that. And you don't need to respond. I understand. You don't need to respond. I just wanted you to know that he's not the only one who worries about that particular issue. I understand, Your Honor. All right. Well, thank you. And thank you for your time. And we'll take a little bit of time for rebuttal. Thank you, Your Honors. I would like to really quickly touch on the standard of review for whether the facts establish specific intent and argue that that mixed question of fact and law, because of the application of complex laws, requires a de novo review. Further, I would like to reemphasize that specific intent can be inferred from the unnecessary infliction by ignoring uniform recommendations from the World Health Organization as well as addressing concerns from the UN Human Rights Council on People with Disabilities and that the uniform recommendation of ECT should only be administered with anesthesia and with muscle relaxants. And further, that the intent is inferred by bypassing any sort of consent protocol. And that administering ECT is one thing. However, administering it in such a uniform and across-the-board manner without actually considering whether it is responsive or therapeutic for the condition further demonstrates specific intent. Thank you. Thank you, Counsel. Ms. Moreno. Thank you, Your Honors. I will make two points. First, the fact that the erratic behavior by itself might be defined differently by different people does not show that the particularity requirement is lacking because the proposed group does not include erratic behavior as the sole component. We're looking at erratic behavior in conjunction with an intellectual disability. And Temuvi Holder, which was cited by the BIA in matter of J-MOM, agreed with this reasoning and analysis. Second, the Mendoza v. Alvarez decision is very different than the case here. There, the group lacked particularity because the group continued to vary in its characteristics throughout the proceedings. When the court mentioned the varying degrees of severity, they made it clear that the degrees of severity related to the multitude of characteristics, such as the access to health insurance and poverty, and not to the disease of diabetes itself. Therefore, we respectfully ask the court to reverse the decision of the board and remand the case. Thank you, Your Honors. Thank you. Thank you to all, Counsel, for your arguments, and particularly the students. Your client's been well served by the petition today, and we wish you the best going forward. And we'll move on to—we'll submit that case, and we will move on to the second argument of the day. Jose Miguel Galan-Najaro v. Barr, case number 19-73030.
judges: Clifton, N.R. Smith, Nelson